[Civ. No. 14427. First Dist., Div. One. Feb. 26, 1951.]

JOHNNY TREMEROLI, Plaintiff and Appellant, v. AUSTIN
TRAILER EQUIPMENT COMPANY (a Corporation)
Defendant and Appellant; UTILITY TRAILER SALES
COMPANY (a Corporation), Defendant and Appellant.

Hadsell, Sweet, Ingalls & Murman for Plaintiff and Appellant.

Brobeck, Phleger & Harrison and Harold H. Price for Defendants and Appellants.

PETERS, P. J.—This action was instituted by Johnny Tremeroli, doing business as Johnny's Trucking Service, against Austin Trailer Equipment Company, a Michigan corporation that manufactures trailer equipment and parts, and Utility Trailer Sales Company, a partnership that sells and installs trucking equipment, to recover damages for losses alleged to have occurred when a tractor and semitrailer of plaintiff were involved in an accident. The accident is alleged to have been caused by reason of the breaking of a portion of a so-called fifth wheel, the device which connects and holds the tractor and semitrailer together. This fifth wheel was manufactured by Austin and purchased from and installed by Utility. The complaint alleges two causes of action against each defendant—one on the theory that defendants were negligent in various alleged particulars, and one for breach of warranty, which the evidence discloses was implied and not express. Each defendant denied the allegations of negligence, denied that there was any warranty, and affirmatively alleged contributory negligence on the part of plaintiff.

The court instructed the jury that, as to Utility, plaintiff had failed to produce any evidence of negligence, and that that issue was withdrawn from its consideration. The court further instructed that, as to Austin, the cause of action based on warranty was withdrawn from the jury's consideration because the evidence demonstrates that there was no privity of contract between plaintiff and Austin. Thus, the case was submitted to the jury, on proper instructions which are not challenged, as to Utility on the issue as to whether there was or was not a breach of implied warranty, and as to Austin whether it was or was not negligent. The jury returned a verdict against both defendants in the sum of $12,500. Both defendants moved for judgment notwithstanding the verdict, which motions were denied, the trial court writing a most helpful memorandum opinion setting forth its reasons for the denial. Judgment on the verdict was then entered, and both defendants moved for a new trial. The motion of Utility was denied, but the motion of Austin was granted on the

ground of insufficiency of the evidence. Again the trial court filed a helpful memorandum opinion explaining the reasons for its actions. In this opinion the court stated that under the provisions of the Uniform Sales Act the seller warrants against latent defects where the buyer makes known the purpose for which the article is required, and it appears that the buyer relied on the seller's skill and judgment. The court held that the evidence disclosed that plaintiff relied on Utility to select the fifth wheel; that the purpose for which it was to be used was known to the seller; that the buyer could not have discovered the latent defect by inspection, and that any hardship on the seller is alleviated by the fact that the seller may recover from the manufacturer any damages recovered from the seller by the buyer. But as to Austin, the trial court stated that its motion for a new trial should be granted because of insufficiency of the evidence. The court stated, in its opinion, that it was not granting the new trial on the issue of contributory negligence on the part of plaintiff. It analyzed, in some detail, the expert testimony introduced, and concluded, as to Austin, that "the evidence leaves the cause of the accident in the realm of surmise and conjecture which will not justify a verdict against" this defendant.

From the judgment and orders the following appeals have been taken:

1. Utility appeals from the judgment and from the order denying its motion for judgment notwithstanding the verdict;

2. Austin appeals from the order denying its motion for judgment notwithstanding the verdict and from the judgment against it. (That this is proper procedure see Code Civ. Proc., § 629, and rule 3(a) of the Rules on Appeal.)

3. Plaintiff appeals from the order granting Austin a new trial.

### The General Facts Applicable to All Appeals

Plaintiff has operated a trucking business for the past 12 years. In 1941, or thereabouts, he started to do business with Utility, and thereafter made several purchases from Utility of trailers, equipment and fifth wheels. In February of 1946 plaintiff purchased a tractor from the Diamond T. Company, and also purchased a semitrailer. He instructed the Diamond T. Company to send the tractor to Utility to have a fifth wheel installed. A fifth wheel is the mechanism by which a tractor, the automotive unit, is hooked up to a semi-trailer, the cargo unit, which has no motor of its own and has

only rear wheels, its front portion resting on the tractor. The hooking and pulling unit between these two pieces of equipment is the fifth wheel. A semitrailer usually comes equipped with its portion of the fifth wheel which fits on top of the lower fifth wheel which has to be installed on the tractor. It is this lower fifth wheel that is here involved. It is a large circular metal plate in which there is a slot to fit the pin of the upper fifth wheel. On either side of the bottom of the lower fifth wheel are bearings or brackets, which are supported by a horizontal axle that passes through the bearings. This axle also passes through other bearings or brackets that are attached to the frame of the tractor. After the accident, later described, these bearings were broken, and plaintiff claims that it was their failure that proximately caused the accident. There is no doubt that the bearings were broken after the accident, and that the breaks are in the form of shearing fractures, that is, a snapping off of parts of each bearing.

Utility is a partnership engaged in the business of selling trailers, and maintaining equipment and fifth wheels. According to plaintiff's testimony, when he, through the Diamond T. Company, ordered the fifth wheel installed, he left the selection of the type of wheel to Utility, as he had in prior transactions, and neither plaintiff nor the Diamond T. Company specified the make or type of fifth wheel to be installed. Plaintiff did not know that an Austin fifth wheel had been installed until he accepted delivery of the equipment after the installation. Utility, at that time, was selling several different types and makes of fifth wheels and it selected the particular type and size of fifth wheel that was installed. One of the partners of Utility testified that when the fifth wheel was ordered he knew for what purpose and use it was intended.

Austin is a Michigan corporation that manufactured the wheel in question. It has manufactured the particular model involved since 1932. Utility was not the agent of Austin. Austin sold the fifth wheel to Utility in the ordinary course of business, and title to the wheel was in Utility before the sale to plaintiff. The bearings of the fifth wheel were manufactured for Austin by the Albion Malleable Iron Company of Michigan according to specifications prepared by Austin.

Plaintiff accepted delivery of the tractor and semitrailer and started to use it in his trucking business. Between February and August 16, 1946, the equipment was driven a

little less than 30,000 miles, the last two months by Pearson, a truck driver with some 17 years' experience who had worked for plaintiff for about a year. On August 16, 1946, plaintiff received an order to transport 1,400 lugs of pears from Lake County to Los Angeles. This was a normal load. Plaintiff dispatched Pearson to take care of the order. Pearson testified that he checked the equipment before starting on the trip, including a check of the brakes and of the fifth wheel to see that it was locked. He picked up his load in Lake County and started towards San Francisco. The pears were properly loaded in the semitrailer. Pearson had proceeded about 14 miles on his return trip when the accident occurred. At that time he was proceeding on an uphill winding two-lane highway, which was about 20 feet wide with a 4-foot shoulder. The surface of the road was oil gravel and the day was sunny. While travelling around a sharp left turn Pearson sensed that the equipment was not steering properly. He looked back at the semitrailer and discovered that it was "climbing" towards the cab of the tractor, apparently because the semitrailer had fallen onto the wheels of the tractor. The semitrailer came forward and hit the right side of the cab of the tractor which was pushed forward almost against the dashboard. Pearson stopped, and the semitrailer fell against an embankment. Pearson could not remember whether he had put on the brakes when he first observed what was happening. The tractor was equipped with a governor on each gear. Prior to the accident Pearson had been in low gear and had just shifted to the next higher gear when he noticed something wrong. The maximum speed that he could have been going in low gear was 19 miles per hour, while the maximum speed he could have been travelling in the next highest gear was 22 or 23 miles per hour. After he stopped, and after he alighted from the tractor, the equipment was hit by another vehicle. Pearson was charged by the highway patrol with speeding, and the court's docket indicates that he pleaded guilty and was fined $25. He testified, however, that he did not plead guilty but that the fine was a compromise and was paid so that he would not have to lose time from his work by appearing for trial.

A state highway patrolman, Burriss by name, investigated the accident. A portion of his deposition was read into the record at the trial. He testified that after the accident there were skid marks extending back from where the equipment came to rest; that, based upon his examination of these skid

marks, he estimated that the semitrailer broke loose from the tractor 80 or 90 feet back from where the equipment stopped; that these skid marks were not brake skids but side skids; that the cross members of the semitrailer could not have fallen on the wheels of the tractor until the fifth wheel had broken. He observed, after the accident, that there were two broken bearings.

Artal, a tow truck operator, testified that after the accident a portion of the fifth wheel normally attached to the tractor was hanging from the kingpin of the semitrailer, and that the bearings had broken.

Schroeder, a mechanic employed by plaintiff, testified that it was his duty to and that he did check each piece of equipment operated by plaintiff after every trip; that this was done never less than once a week; that the checking included tightening of the bolts on the fifth wheel, checking and adjusting the brakes and the greasing of the equipment; that as to the particular unit here involved he gave it a routine but not a complete checkup the day before the accident, but that within a month prior to the accident he had given it a complete check; that he visited the scene of the accident before the equipment was removed and observed the broken bearings; that portions of the bearings that should have been on the tractor were hanging from the pin of the trailer, and a broken piece was lying on the plate of the fifth wheel; that he picked up one of the portions of the broken bearing and observed along the line of the new break a "bubble formation"; that the line of the break "was not broken clean across; there was like a little hollow spot in it" in the center of the fracture between an eighth or a quarter of an inch in width; that the hollow spot was of a different color than the rest of the metal, being "a blackish color." Schroeder showed the broken piece of the bearing to Pearson, the driver, who also testified as to this "bubble" and the discoloration within the line of the new break. This portion of the bearing was lost during the period the equipment was being repaired and so, of course, was not produced at the trial. There was no corresponding discoloration on the piece of the bearing that was still attached to the equipment.

The bearings involved were made of malleable iron. Both sides produced expert testimony as to the chemical, metallurgical and physical characteristics of the castings. Plaintiff called Anderson, a chemist, who had analyzed drillings from the portions of the bearings available. He testified that from

his chemical examination the bearings demonstrated that they had a high sulphur content "showing the castings to be of inferior quality"; that, according to the standard authorities, the sulphur content should not exceed .12, while a good quality casting should not have over .07 sulphur. His tests showed that the broken bearing or bracket had a sulphur content of .203 in one bracket and .205 in the other. Too much sulphur, according to the witness, "gives general weakness to the casting" and "tends towards brittleness. . . . It interferes with the annealing properties" of the metal. His tests were chemical only, and he admitted that physical and use tests would show other qualities of the metal. High sulphur content indicates only that the material was inferior, it does not indicate, necessarily, the strength of the material. This can only be ascertained by field tests.

The witness Clark was also a chemist called by plaintiff. He too made chemical tests of the bearings and found, in two tests, a sulphur content of .196 and .198, while the maximum specification of the A.S.T.M. (American Society for Testing Materials) was .12. He too agreed that a high sulphur content had a tendency to create brittleness. He made no physical tests and did not know the tensile strength, yield point or elongation per cent of the bearings. Physical or field tests would demonstrate the ductility of the metal and he had not made these. Although the fact that the bearings broke in use was a sort of field test, Clark would not state that there was too much sulphur in the bearings for the purpose for which they were intended.

Defendants also produced certain experts. Morse, a metallurgical engineer, was called by Austin. He pointed out that the A.S.T.M. figures were recommendations and not requirements, and that other recognized authorities recommended that the sulphur content of malleable iron should be less than .25 per cent, and that these samples had .203 and .205 of sulphur. It was his view that brittleness could not be determined from chemical tests, and that physical tests were required. It was also his opinion that the fractures of the castings here involved were normal for ductile malleable castings; that if there had been a hollow spot, which he called a "blow-hole," in the piece of the casting as testified to by Schroeder, it would show up in the mate of that broken piece, but there was no indication of such in the pieces of the bearings before the court. Morse gave it as his opinion that the castings were not brittle, had normal ductility, and were

normal iron castings. In his opinion, the bearings did not have an unusually high sulphur content.

Austin also produced Dorn, a professor of physical metallurgy at the University of California, who had made certain physical tests of the pieces of the bearings before the court. He found that the shear strength of one bearing was 47,236 pounds per square inch, which he stated was normal for sound malleable iron, and the tensile strength of the same specimen he found to be 59,950 pounds per square inch, which is within the specifications recommended by A.S.T.M. A flange from one of the bearings was tested and found to have a shear strength of 44,820 pounds per square inch, which appeared to him to be a safe value, while the tensile strength of this sample was 54,340 pounds per square inch. The elongation of the sample was 15 per cent, which he stated to be within the specifications for malleable iron of A.S.T.M. He admitted that the various properties of a casting vary from point to point within a particular casting. He believed that malleable iron was a proper material to use for the brackets in question, and that they were not brittle. In reference to the "bubble," he testified that if it appeared on one-half of a fractured piece it would "usually" appear on the other half. Later he was more positive, stating that it "must be on the other portion," and there were no indications on the piece of the broken bearings before the court of any such "bubble."

The evidence shows that from February to August, 1946, the equipment had been in constant use hauling loads of 30,000 to 40,000 pounds over all kinds of roads. The speedometer on the tractor showed that it had travelled 29,648 miles. The load of pears being hauled at the time of the accident weighed 42,000 pounds. This would mean that the fifth wheel was then carrying 25,000 pounds. Seyferth, a vice-president of Austin, testified that the fifth wheel was designed to carry 40,000 pounds static weight—a nonmoving dead weight—with a safety factor up to 200,000 pounds. The wheel was designed to stand the effects of jackknifing and sudden stopping. Durrell, of Utility, testified that under the worst conditions a fifth wheel should operate 25 to 30,000 miles without maintenance. With proper maintenance, and there was substantial evidence of such maintenance here, the wheel should go 100 to 125,000 miles without replacing the rubber bushings.

The bearings were made by the Albion Malleable Iron Company according to specification and design furnished by

Austin. Austin drilled the castings at its factory. Seyferth testified that Albion made physical tensile tests of samples from each "heat" or batch of bearings to ascertain that the bearings had a tensile strength of 50,000 pounds per square inch, which was the minimum specification of Austin. Austin also made tensile strength tests of bearings selected at random. In addition, the machinists who drilled the holes in the bearings at the Austin factory inspected the holes and the drillings for any defects that would be apparent to the eye. A second machinist makes a similar inspection, and so does a line inspector. After the fifth wheel is assembled, a final inspection of the fifth wheel is made. Austin makes no chemical tests.

There is substantial, although conflicting, testimony that plaintiff relied on Utility to select the make and type of fifth wheel. Utility admittedly knew the purpose and intended use of the wheel. Durrell, one of the partners of Utility, testified that, in the past, the plaintiff on three or four occasions had specified that Austin fifth wheels be installed, and that, since the accident, plaintiff had ordered by name at least two fifth wheels. This testimony was specifically denied by plaintiff who stated that he had never told Utility a specific make of fifth wheel to install either before or after the accident. As to the purchase of the particular fifth wheel here involved the written order taken by Durrell does not mention an Austin installation, nor does the statement rendered by Utility to plaintiff mention an Austin fifth wheel. A repair order does mention Austin, but that was apparently written in by an employee of Utility.

### The Appeal of Utility

This appellant is the seller of the fifth wheel. It appeals from the judgment and from the order denying its motion for judgment notwithstanding the verdict. It was held liable on the theory of breach of an implied warranty of fitness for a particular purpose. This warranty is part of the Uniform Sales Act and is embodied in section 1735 of the Civil Code, which reads, in part, as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manu-

facturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.''

The evidence supports the implied finding of the jury that there was a breach of this implied warranty. This appellant analyzes the expert testimony and comes to the conclusion that there is no basis for the jury's award other than mere surmise, guess or conjecture. It points out that its experts testified that the bearings had good ductility, while plaintiff's testimony, at most, showed that the castings might be brittle. Although it does not so state in express terms, it seems to be the thought of this appellant that, before it can be held liable on the warranty, the plaintiff must show, in some way, some act of negligence on its part that contributed to the accident. At one place Utility directly states that ''If the evidence does not justify a verdict against the manufacturer for the reason stated, then there is no justification for the verdict against the seller.'' (Utility's Op. Br. p. 17.) Utility misconceives the law. The manufacturer's liability is based on negligence, but that of the seller is predicated upon warranty. ■ Negligence is no part of the warranty cause of action. In *Vaccarezza v. Sanguinetti*, 71 Cal.App.2d 687, 689 [163 P.2d 470], this court, in speaking of a cause of action based on section 1735 of the Civil Code, stated: ''The action is not based upon the negligence of defendants but upon breach of the implied warranty of fitness for the purpose for which purchased. (Civ. Code, § 1735.) The section imposes an absolute liability regardless of negligence. [Citing authorities.]'' ■ Whether the plaintiff proved that the fifth wheel was defectively manufactured or not is immaterial, if in fact he offered evidence that it was not reasonably fit for the purpose for which it was sold. The seller knew the purpose for which the fifth wheel was required. As already pointed out, the evidence supports the implied finding that the plaintiff relied on the seller's skill and judgment to select and to install a fifth wheel that would fill the desired purpose. Although the evidence is conflicting, there is substantial evidence that the fifth wheel failed in normal use. There is substantial evidence that the fifth wheel was properly serviced and maintained by plaintiff. This evidence, without proof of the cause of the failure, sustains the finding of the jury that there was a breach of the warranty.

■ Utility argues at some length that the evidence does not show that the failure of the bearings was the proximate cause of the accident. This was a question of fact for the

jury. As this court recently stated in another fifth wheel case: "It is elementary law that on such an appeal this court cannot disturb a finding of fact unless there is no evidence or no reasonable inference from the evidence to sustain that finding. [Citing cases.] The above rule applies to a finding of proximate causation." (*Oregon etc. Freight, Inc.* v. *Fruehauf etc. Co.*, 83 Cal.App.2d 620, 624 [189 P.2d 329].)

There is substantial evidence that the fifth wheel broke some 80 or 90 feet before the equipment smashed into the embankment. Although there is evidence from which it might be inferred that some other factor than failure of the fifth wheel in normal use—such as the driving of plaintiff's driver —caused the accident, there is substantial evidence from which it may be inferred that the breaking of the wheel in normal use caused the accident. This being so, the implied finding of the jury on proximate cause cannot be disturbed.

Utility also argues that there is no evidence that the fifth wheel was not reasonably fit for the use intended. This was a question of fact. While the seller does not warrant absolute safety, he does warrant that the article is reasonably fit for the purpose intended. When a mechanical device fails in normal use and has been properly maintained, that is a field test that supports the implied finding of the jury that it was not reasonably fit for the purpose intended. The testimony of the experts as to tests made by them merely creates a conflict.

Utility also contends that there was no evidence of a latent defect. Even if such evidence were necessary to show breach of warranty (and such evidence is not necessary), there is ample evidence to show that the castings had too high a sulphur content, which would have a tendency to make them brittle, and there is substantial evidence of the "bubble" in the fracture line of one of the broken bearings.

It is next apparently urged that, in the absence of knowledge on the part of the seller of a latent defect, the seller, who is not the manufacturer, is not liable for damage caused by a latent defect. In this connection *Tourte* v. *Horton Mfg. Co.*, 108 Cal.App. 22 [290 P. 919] is cited. That case undoubtedly held that a seller who was not a manufacturer was not liable for a latent defect, at least where the buyer had knowledge of the defect. That case was decided under the law as it existed prior to the adoption of the Uniform Sales Act in this state. While there are a few cases that hold that it was not the intention of the Sales Act to make a seller who

is not the manufacturer liable for damages caused by a latent defect (see *United States F. & G. Co.* v. *Western Iron Stores Co.* 196 Wis. 339 [220 N.W. 192, 59 A.L.R. 1232]), the substantial weight of authority is to the effect that, under the Uniform Sales Act, the implied warranty extends to latent defects. (See annotation 59 A.L.R. 1235; see discussion 21 Ind. Law Journal 231; see *Wasserstrom* v. *Cohen, Frank & Co.,* 165 App.Div. 171 [150 N.Y.S. 638].) This appeals to us as sound law.

 Utility next urges that where the buyer and seller have equal skill, and equal opportunity to inform themselves of the defect, no inference of reliance will arise. The cases cited are all cases where the issue was whether the buyer relied on the seller, or exercised an independent judgment. Where the defect is latent and where, as here, there is evidence that the seller knew the purposes for which the fifth wheel was wanted, and evidence that the buyer relied on the seller to supply a fifth wheel that would perform that function, the parties are not on an equal footing, because in such a situation section 1735 of the Civil Code imposes against the seller a warranty, even against latent defects.

We therefore conclude that the trial court correctly denied the motion of this appellant for judgment notwithstanding the verdict. It is also clear that the implied finding of the jury that Utility breached the implied warranty of fitness for a particular purpose is amply supported. The question of the propriety of the amount of the award will be discussed later, because the issue of damages is common to all appeals.

### The Appeals of Tremeroli and Austin

Austin is the manufacturer. Its liability, if any, is dependent on negligence. It appeals from the order denying its motion for judgment notwithstanding the verdict, and is also the respondent on plaintiff's appeal from the order granting it a new trial.

 The fact that the trial court granted Austin a new trial on the ground of insufficiency of the evidence does not determine that the trial court should have granted the motion for judgment notwithstanding the verdict. Different principles govern these motions. Austin is entitled to a judgment notwithstanding the verdict only if there is no conflict in the evidence on the issue of negligence. If there is a conflict, the motion was properly denied. On the other hand, the plaintiff is entitled to a reversal of the order granting

Austin a new trial on the ground of insufficiency of the evidence only if the evidence without conflict shows that Austin was negligent. If there is a conflict on the issue it was within the power of the trial court to grant a new trial on the ground stated. *Estate of Green,* 25 Cal.2d 535 [154 P.2d 692], states both rules. At page 542 it states the rule applicable to appeals from an order granting a new trial on insufficiency of the evidence by quoting from *Hames* v. *Rust,* 14 Cal.2d 119, 124 [92 P.2d 1010], as follows: " 'When the motion is granted, as here, for insufficiency of the evidence, it is only in rare cases showing abuse of discretion that an appellate court will interfere because the trial judge must weigh all the evidence and determine the just conclusion to be drawn therefrom. [Citing a case.] It cannot be held that a trial court has abused its discretion where there is a conflict in the evidence or where there is any evidence which would support a judgment in favor of the moving party.' " (See, also, *Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305, 307 [163 P.2d 689].)

At page 546 of *Estate of Green* the court states the rule applicable to an appeal from an order denying a judgment notwithstanding the verdict by quoting the following from *Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]:

" 'The right of the trial court to set aside a verdict and enter a contrary judgment is absolutely the same as its right to grant a nonsuit. [Citing authorities.] The court should, therefore, grant such a motion when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff. [Citing authorities.]' . . . It is true the court held that the evidence was insufficient to support the verdict of the jury and that a new trial should be granted, but even though the court might be justified in granting a new trial, it would not be justified in directing a verdict or in granting a motion ·for judgment notwithstanding the verdict."

Thus, it is apparent that if there was a conflict in the evidence on the issue of Austin's negligence, there is no merit in either of the appeals now under consideration. ■■■ It is, of course, the law that, although a manufacturer who is not the seller to the consumer is not liable to the consumer in warranty, it is liable for its negligence. Privity is no longer required. (*Sheward* v. *Virtue,* 20 Cal.2d 410 [126·P.2d 345],

and cases therein cited.) At page 412 of that case appears the following: ''No serious contention may be made by Virtue Brothers that they did not owe a duty of care toward the plaintiff in the manufacture of the chair because privity of contract between them was absent. The courts of this state are committed to the doctrine that the duty of care exists in the absence of privity of contract not only where the article manufactured is inherently dangerous but also where it is reasonably certain, if negligently manufactured or constructed, to place life and limb in peril. [Citing cases.]''

The evidence on the issue under consideration has already been summarized. We think that the evidence and the reasonable inferences therefrom would support a finding either way on this issue. There is expert evidence that the broken fifth wheel had a high sulphur content in excess of the amount recommended for such castings. There is evidence that such an amount of sulphur would tend to make the casting brittle. Austin's experts made certain physical tests and testified that the castings were of normal strength for the use intended. Whether a high sulphur content causes brittleness, and whether these castings were brittle, were subjects on which the evidence and the reasonable inferences therefrom were in conflict. There was also evidence given by two witnesses for plaintiff that there was a ''bubble'' in one part of the broken casting along the line of the break. If such ''bubble'' existed, it showed negligence in the manufacturing process. Although the experts called by Austin and Utility doubted the existence of this ''bubble,'' and could not explain it, that merely created a conflict. The evidence of Austin as to the tests made during and after manufacture is not conclusive. Under the circumstances it was for the jury to determine this issue, or for the trial court on motion for new trial. The evidence and the reasonable inferences therefrom are in conflict.

Plaintiff places considerable reliance on the case of *Oregon, etc. Freight, Inc.* v. *Fruehauf, etc. Co.*, 83 Cal.App.2d 620 [189 P.2d 329]. That is a case involving the failure of a fifth wheel. It is an action by the buyer against the manufacturer. The appeal was by the manufacturer from a judgment against it. The evidence was conflicting as to whether a key weld was strong or weak. In sustaining the judgment in favor of the plaintiff this court stated (p. 624): ''It is elementary law that on such an appeal this court cannot disturb a finding of fact unless there is no evidence or no

reasonable inference from the evidence to sustain that finding. [Citing cases.] The above rule applies to a finding of proximate causation." This case would be in point had the trial court denied the motion for a new trial, and had Austin then appealed from the judgment. It is not in point here where the trial court has granted the motion for a new trial.

The trial court correctly denied the motion for judgment notwithstanding the verdict, and acted within its powers in granting Austin's motion for a new trial on the ground of insufficiency of the evidence.

### The Issue of Damages

This issue presents the most troublesome problem involved on these appeals. The jury verdicts against Utility and Austin were for $12,500. Both contend that the damages awarded are excessive and not supported by the evidence. While the judgment against Austin has been set aside, in view of the new trial it has a direct interest on this damage issue.

The measure of damages for breach of warranty is set forth in section 1789(6) of the Civil Code. It provides that: "The measure of damages for breach of warranty is the loss directly and naturally resulting in the ordinary course of events from the breach of warranty." In tort actions, generally, section 3333 of the Civil Code provides that the measure of damages "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." For the purposes of this action no substantial differences exist between these sections, and the parties stipulated that the measure of damages in the negligence and in the breach of warranty actions were identical.

The burden of proof, of course, is on the plaintiff to prove his damages with reasonable certainty. In this type of action cost of repairs, other costs caused by the injury, loss of profits, cost of rental of substitute equipment and similar charges are the normal items of damage.

The plaintiff proved that, as a result of the accident, he incurred the following direct charges:

| | |
|---|---:|
| Repairs to tractor | $2,063.67 |
| Repairs to semitrailer | 2,429.52 |
| Paid for cargo loss | 746.34 |
| Towing charges | 381.27 |
| Salvage labor costs | 66.75 |
| Flagman at accident | 82.50 |
| Total | $5,770.05 |

These items were directly and proximately caused by the accident and are clearly recoverable. No contention is made to the contrary.

In partial support of the balance of the award, plaintiff refers to certain cancelled checks introduced by him totalling $4,305.02, which represent sums paid by him to subhaulers to carry out contracts he was unable to fulfill because of the damage to his equipment. Plaintiff further testified that his customers paid him the contract price for these hauls, and that he then remitted these sums to the subhaulers, retaining 10 per cent for administrative costs and a further sum for taxes. In other words, plaintiff acted as a conduit for these funds, the customers paying him the contract price, and he remitted these sums less out-of-pocket administrative and tax charges. It seems too clear to require extended discussion that the sums paid to subhaulers did not constitute the damage suffered by plaintiff. The plaintiff is entitled to be placed in the same position, from a monetary standpoint, that he would have been in, had the accident not occurred. He was obligated by contract to carry certain hauls. Had the accident not happened, he would not have made as net profit the amounts that would have been paid to him by his customers. That is a gross figure. In addition to his administrative and tax costs he would have had to pay a truck driver, and other costs of operation of the equipment that was damaged. The difference between what he would have been paid by his customers and his cost of operation is obviously the profit that he would have made. That is what he is entitled to recover so far as this item is concerned. ▮ But as to such loss of profits there was no evidence produced at all. In fact, the plaintiff tried to introduce such evidence but the trial court erroneously refused to permit him to testify on this subject. Thus, there is a complete lack of evidence on this item of damage. The payments to the subhaulers did not come out of his pocket at all. If he recovers such sums from the defendants he will be in a better position than he would have been had the accident not occurred.

The conclusion that the $4,305.02 paid to subhaulers cannot support the award here challenged would be perfectly clear were it not for the rules of law announced in such cases as *Anheuser-Busch, Inc.* v. *Starley*, 28 Cal.2d 347 [170 P.2d 448, 166 A.L.R. 198], and *Gersick* v. *Shilling*, 97 Cal.App.2d 641 [218 P.2d 583]. (See, also, discussion 15 Am.Jur. p. 615,

§ 198; 18 A.L.R. 678; 95 A.L.R. 575.) Although these authorities are not cited by the parties, they should be mentioned.

These authorities announce the rule that total or partial compensation received by an injured party from a collateral source wholly independent of the wrongdoer will not lessen the damages recoverable from the person causing the injury, apparently because the damages recoverable in tort cases at least are considered as not being solely compensatory but are thought of as being partially punitive. Thus, in the Anheuser-Busch case the cargo being transported by a common carrier was damaged when the carrier was hit by the car of the defendant. Plaintiff sued defendant. The evidence showed that the common carrier had reimbursed the plaintiff for his loss. The Supreme Court held that such payment did not reduce plaintiff's recovery from defendant—it was a recovery from a collateral source wholly independent of the wrongdoer. In the Gersick case it was held that an injured person was entitled to recover the full amount paid a hospital as a result of the accident even though the injured person was fully reimbursed for such expenditures because of an insurance policy for which a premium had been paid. The same rule seems to apply to wages paid an injured person by the employer. The injured employee may still recover the full amount of such wages from the wrongdoer.

The rule of those cases is not applicable here. In those cases the item of damage involved was recoverable *in toto* from the wrongdoer. It was merely a fortuitous circumstance that the injured person received reimbursement from some collateral source. The wrongdoer should not benefit from such a fortuitous circumstance. ■ Here the item of damage recoverable was loss of profits, not the sums paid the sub-haulers or the sums received from the customers. There was no evidence of such profits. It is obvious, therefore, that this item of $4,305.02 does not support the award. This loss of profits may be shown on the retrial.

■ Plaintiff also seeks to support the award, in part, on the theory that he was entitled to recover the reasonable value of the loss sustained by being deprived of the use of his vehicles. In a proper case loss of use is a recoverable item. (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840 [147 P.2d 558].) ■ In some cases this may be shown by the reasonable rental value of such equipment whether or not such substitute equipment was in fact rented. (*Malinson* v. *Black*, 83 Cal. App.2d 375 [188 P.2d 788].) In the instant case plaintiff

testified that he was unable to rent other equipment, but there was no testimony at all as to what the rental value of such equipment would have been. In every case cited by plaintiff where value of loss of use has been recovered, there was some proof of the value of such loss of use. Such proof is indispensable.

Of course, double recovery cannot be allowed. If, on the retrial, full profits that would have been earned are recovered, that necessarily includes compensation for loss of use. If evidence of profits is not available, loss of use may be shown by what it would have cost to rent comparable equipment. But some proof must be produced on these issues.

As the record now stands, the only damage proved was as to money expended for or incidental to the repairs—$5,770.05. Other damage was undoubtedly suffered by plaintiff but he failed to prove what that damage may have been. The judgment for $12,500 against Utility cannot stand. A new trial as to it on the issue of damages alone should be had.

According to the orders about to be made the cause will have to be retried. As to Utility, liability has already been found to exist and the retrial will be had on the issue of damages alone. As to Austin, both the question of liability and the amount of damage must be retried.

The following orders dispose of the various appeals:

1. The order granting Austin a new trial is affirmed.

2. The appeal of Austin from the order denying its motion for judgment notwithstanding the verdict is dismissed. (*Goodman* v. *Atchison, T. & S. F. Ry. Co.*, 94 Cal.App.2d 745 [211 P.2d 310].)

3. The judgment against Utility is reversed and the cause remanded for a new trial as to Utility solely upon the issue of the amount of damages suffered. The trial court is directed, upon the settlement of that issue, to enter judgment in favor of plaintiff and against Utility in the amount so fixed.

4. The order denying the motion of Utility for judgment notwithstanding the verdict is affirmed.

5. All parties to bear their own costs on these appeals.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied March 28, 1951, and defendants and appellants' petition for a hearing by the Supreme Court was denied April 26, 1951.