[Civ. No. 26213. First Dist., Div. One. Nov. 20, 1970.]

ELLA W. PUTENSEN, Plaintiff and Appellant, v.
CLAY ADAMS, INCORPORATED et al., Defendants and Respondents.

1064

## COUNSEL

Herron & Winn, John Wynne Herron and Dennis B. Conklin for Plaintiff and Appellant.

Cushing, Cullinan, Hancock & Rothert, John Lockley, Bledsoe, Smith, Cathcart, Johnson & Rogers, Robert A. Seligson, Anthony Dougherty, Clark, Heafey & Martin, Chris G. Gasparich and P. Gerhardt Zacher for Defendants and Respondents.

## OPINION

MOLINARI, P. J.—In this action for damages for personal injuries brought by plaintiff against Clay Adams, Incorporated, a corporation (hereinafter referred to as "Clay Adams"), H. W. Paley (hereinafter referred to as "Dr. Paley"), and Mount Zion Hospital and Medical Center, a nonprofit corporation (hereinafter referred to as the "Hospital"), plaintiff appeals from a judgment of nonsuit in favor of Clay Adams and a judgment upon a verdict in favor of Dr. Paley and the Hospital in a case tried before a jury.

### The Facts

Plaintiff, with a history of a heart ailment, entered the Hospital for the purpose of undergoing a heart catheterization procedure. This procedure was diagnostic in nature and for the purpose of determining the extent of aortic insufficiency. Plaintiff testified that she underwent such operation without any explanation of what precisely was involved or the attendant risks. However, plaintiff also stated that she told Dr. Paley, who performed the procedure, that she preferred to remain ignorant of the operation. Plaintiff also admitted that she was aware, prior to said operation, of the general nature of a heart catheterization. There was also evidence that plaintiff had talked with a Doctor Bine regarding the advisability of a heart catheterization.

The subject procedure consists of the insertion of tubing through a needle puncture in the right femoral artery and then up through the artery and into the aorta at a point near the heart. The tubing is used to carry radio opaque material into the aorta as part of the diagnostic procedure. When this operation was performed on plaintiff the procedure had proceeded to the point where the tubing was positioned in the aorta when Dr. Paley noted that a "kink" had developed in the tubing. His attempts to straighten the tubing were unsuccessful. Plaintiff was thereupon taken to surgery where the "kinked" tubing was removed from the artery by surgical procedure. This surgical operation was required because the tubing could not be safely removed except by surgery.

The subject tubing was a polyethylene tubing manufactured by Clay Adams and was designated by it as PE-280. This tubing was purchased

by the Hospital in 100-foot rolls. When it was received Dr. Paley examined it to see if it had the right degree of flexibility for its use. In preparing the PE-280 tubing for use as a catheter approximately 4 feet in length was cut from one of the rolls. This length of the PE-280 tubing was then inserted over a tubing of smaller diameter known as PE-160 tubing. The PE-280 tubing was then stretched to narrow its diameter so that it would fit snugly over the PE-160 tubing. This stretching process would stretch the tubing 7, 8 or 9 inches. The leading end of both the PE-280 and PE-160 tubings were then cut and the PE-160 tubing was removed. The end of the PE-280 tubing was then trimmed or beveled with an emery board and the tubing was then soaked for at least 24 hours prior to its use in a detergicide solution. This fabrication procedure was performed under the direction of Dr. Paley. When the PE-280 catheter was completed Dr. Paley examined it in detail by visual and tactile examination. The tactile examination consisted of running his fingers along it and bending it in a wide arc to see if it was flexible. Dr. Paley at no time made any tests as to the strength of the walls of the PE-280 tubing.

In performing the subject diagnostic procedure a PE-160 tubing is inserted into the femoral artery and a wire is put through it. Then the PE-160 tubing is withdrawn from the artery leaving only the wire in the artery. Then a second PE-160 tubing is inserted over the wire, and the deterged PE-280 tubing is inserted over the PE-160 tubing. When the entire ensemble reaches a position close to the descending aorta the wire and PE-160 tubing are withdrawn leaving only the PE-280 tubing in the artery. The PE-280 tubing is then advanced to a few inches below the aortic arch. The PE-280 tubing, operated at the external end by a a syringe, is then filled with radio opaque material and then advanced under fluoroscopic vision beyond the aortic arch. It was during this latter procedure in the instant case that Dr. Paley discovered the "kink" in the tubing. Prior to this observation Dr. Paley had experienced difficulty getting the PE-280 tubing beyond the aortic arch. Instead of going around the arch the tubing repeatedly went up into the left common carotid artery.

Dr. Paley testified that he had read the literature accompanying the PE-280 tubing and that this literature suggested that the tubing was useful for moving fluids into and from body cavities. From this literature Dr. Paley implied that the tubing was suitable for heart catheterization. Dr. Paley stated further that his decision to use PE-280 tubing in the heart catheterization procedure was based on this literature and from medical journals articles suggesting that it was appropriate therefor. Such articles did not derive from Clay Adams, however. Dr. Paley acknowledged that none of Clay Adams' literature specifically mentioned the use of PE-280 tubing in a human heart catheterization.

Dr. Paley further testified that he had performed approximately 100 other heart catheterizations, using PE-280 tubing, all without such a "kinking" mishap. He stated that several other heart catheterization operations had been done prior to the incident one, using PE-280 tubing from the roll used for plaintiff's operation, without such a mishap.

A vice-president of Clay Adams testified that he was aware that PE-280 tubing was being used as a raw material from which heart catheters were fabricated and that Clay Adams never questioned this use. He testified, further, that such use was not suggested by Clay Adams, that it was not Clay Adams' policy to determine or suggest uses, and that the use to which the tubing was put was a matter to be determined by the user. This witness also testified that the walls of the PE-280 tubing varied slightly in thickness and that no specific tests were conducted prior to sale to determine the strength of the walls.

A former university engineering professor, testifying as an expert, testified that he had conducted experiments on some of the PE-280 tubing. These experiments revealed that the PE-280 tubing "kinked" easily, that it was more apt to "kink" when heated or soaked, and that once it became "kinked" it failed to recover physical integrity.[1]

Other facts which may be pertinent to a particular discussion will be stated in conjunction therewith. We proceed to discuss the several contentions made by plaintiff with the observation that the instant action is one for damages for personal injuries alleged to have been suffered as a result of the subject procedure. As against Clay Adams the action, as disclosed by the issues tendered, is one sounding in strict liability in tort, breach of express and/or implied warranty, and negligent manufacture; as against Dr. Paley and the Hospital, it sounds in medical malpractice.

### Nonsuit

In considering the several contentions of plaintiff with respect to Clay Adams we do so, initially, upon an application of the following well-settled principle: A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiff's favor, it can be said that there is no evidence to support a jury verdict in his favor. (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578,

---

[1]The experiments were not performed on the tubing used in the procedure or on any of the tubing from the roll from which the instant tubing was cut as none of these were available at the time of the experiment.

583 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406]; *Estate of Callahan,* 67 Cal.2d 609, 612 [63 Cal.Rptr. 277, 432 P.2d 965].)

### Strict Liability in Tort

 Plaintiff urges that the doctrine of strict liability in tort was applicable because of the evidence that the tubing kinked easily, that no tests were conducted by Clay Adams to ascertain the tubing's strength and that no warning was given of the failure to make such tests.

 In California the rule of strict liability is stated thusly: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 260-261 [37 Cal.Rptr. 896, 391 P.2d 168]; *Elmore* v. *American Motors Corp., supra,* 70 Cal.2d 578, 583; *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229].) This liability extends not only to actual consumers or users but to any human being to whom an injury from the defect is reasonably foreseeable. (*Elmore* v. *American Motors Corp., supra,* at p. 586; *Johnson* v. *Standard Brands Paint Co.,* 274 Cal.App.2d 331, 338 [79 Cal.Rptr. 194].)

In *Pike, supra,* the standard of strict liability as stated in the Restatement Second of Torts, section 402A, was adopted by our California Supreme Court. That standard is stated thusly: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." (Rest.2d Torts, § 402A, pp. 347-348; *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 475; see *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 52 [46 Cal.Rptr. 552], and *Read* v. *Safeway Stores, Inc.* (1968) 264 Cal.App.2d 404, 407 [70 Cal.Rptr. 454], which also cite this rule with approval.) In the context of this rule the standard of strict liability applies to a defect in design as well as a defect in manufacture. (*Pike* v. *Frank G. Hough Co., supra;* see *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 64.)

 Adverting to the present case and to the evidence most favorable to plaintiff, we observe that Clay Adams placed the PE-280 tubing on the market knowing that it was to be used as a catheter and with knowledge

that it was being used in heart catheterizations. The evidence adduced is also susceptible of the inference that this tubing was placed on the market knowing that it was to be used without inspection for defects. Here, although Dr. Paley did examine the tubing with respect to its flexibility, he did not inspect it for defects. The record also discloses that the subject tubing proved to have a defect that caused injury to a human being. However, notwithstanding the evidence of these essentials which, at first blush, would appear to bring the rule of strict liability into play under the general principle declared in *Greenman, Vandermark* and *Elmore,* the requirement of the Restatement recognized in *Pike* that the product must be one which "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold" is not fulfilled. That requirement, as we perceive it, is explanatory of the requirement of the *Greenman* rule that the product must be one which the seller knows "is to be used without inspection for defects." (P. 62.)

In the instant case the record is vague as to whether Clay Adams expected the PE-280 tubing to reach the user or consumer without substantial change in the condition in which it was sold. It is clear, however, that such tubing reached plaintiff after it had undergone a substantial change in the condition in which it was sold. It had been stretched, soaked and drawn over another tube by Dr. Paley or under his direction. Our situation is not one in which the tubing was incorporated into the catheter as a component part thereof without undergoing any change in which case the doctrine of strict liability can apply (see Rest.2d Torts, § 402A, *supra,* coms. (p) and (q), pp. 357-358), but one in which the tubing had undergone the substantial changes and the further processing we have described. Under these circumstances the question is essentially one of whether the responsibility for the discovery and prevention of a dangerous defect is shifted to the intermediate party who makes the changes. (See Rest.2d Torts, § 402A, *supra.*)

Under the circumstances of this case there is a likelihood that the physical integrity of the PE-280 tubing was impaired by the substantial changes it underwent under Dr. Paley's directions. Adverting to the alleged defect, we observe that it is alleged to be a "kink" in the tubing. Although Dr. Paley did not subject the tubing to a test for defects prior to making the changes, he did test it for flexibility. This adaptability test did not reveal any propensity on the part of the tubing to kink prior to the stretching and soaking process. Moreover, the uncontradicted evidence discloses that the PE-280 tubing, while in plaintiff's femoral artery, was subjected to various manipulations in attempting to get it beyond the aortic arch. Accordingly, a question arises whether the defect which caused the tubing to "kink" arose *after* the

changes and whether the responsibility for the defect shifted to Dr. Paley who undertook to subject the condition of the tubing to these changes.

Here the evidence adduced by plaintiff does not afford a reasonable basis for the conclusion that it is more probable that the "kinking" in the tubing was caused by Clay Adams than that it was not. (See Prosser on Torts (3d ed. 1964) p. 264; *Grinnell* v. *Charles Pfizer & Co.,* 274 Cal.App.2d 424, 435 [79 Cal.Rptr. 369].) It is equally as probable under the circumstances of this case that the "kinking" was Dr. Paley's responsibility. Accordingly, Clay Adams may not be held to strict liability merely because the tubing turned out to be unsuitable for the product into which it was made by Dr. Paley. That liability, if any, must depend on other legal doctrines or rules.

*Res Ipsa Loquitur*

Plaintiff asserts that a nonsuit was improper because the doctrine of res ipsa loquitur applied and therefore the jury was permitted to infer negligence from the happening of the accident alone. (See *Tomei* v. *Henning,* 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633].)

Res ipsa loquitur applies, generally, where the occurrence of the injury is of such a nature that it can be said in the light of past experience that it probably was the result of negligence by someone and that the defendant is probably the person responsible. (*Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322; *Clark* v. *Gibbons,* 66 Cal.2d 399, 408 [58 Cal.Rptr. 125, 426 P.2d 525]; *Springer* v. *Reimers,* 4 Cal.App.3d 325, 332 [84 Cal.Rptr. 486].) Here no contention is made that the doctrine is applicable as a matter of law, but it is urged that the three requisite conditions which give rise to the inference that a proximate cause of the occurrence was some negligent conduct on the part of Clay Adams are present. These conditions are: (1) that the accident or injury be of the kind which normally does not occur absent someone's negligence; (2) that the accident or injury is caused by an instrumentality or agency within the defendant's exclusive control; and (3) that the accident not be due to any voluntary action or contribution by the plaintiff. (*Wolfsmith* v. *Marsh,* 51 Cal.2d 832, 835 [337 P.2d 70, 82 A.L.R.2d 1257]; *Roddiscraft, Inc.* v. *Skelton Logging Co.,* 212 Cal.App. 2d 784, 793 [28 Cal.Rptr. 277]; *Springer* v. *Reimers, supra,* at p. 333.)

In the instant case the first and third conditions were present. The accident was not due to any voluntary action or contribution by plaintiff. In determining whether the probability of negligence appears from the happening of the accident, both common experience and the expert testimony supply a basis that when an accident such as that in the present case occurs, it is

more probable than not the result of negligence. (See *Tomei v. Henning, supra,* 67 Cal.2d 319, 322; *Davis v. Memorial Hospital,* 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561].) Here, both plaintiff's expert engineer witness and Dr. Paley gave evidence to the effect that the accident was caused by the "kinking" of the tubing and both implied that had the tubing not been negligently constructed by Clay Adams the accident would not have occurred. In any event, it is a matter of common knowledge among laymen that the use of a catheter in an artery is not ordinarily harmful unless someone is negligent. (See *Davis v. Memorial Hospital, supra,* where insertion of enema tube caused abscess; *Wolfsmith v. Marsh, supra,* 51 Cal. 2d 832, 835, where the plaintiff developed a thrombosis after an injection of sodium pentathol; *Bauer v. Otis,* 133 Cal.App.2d 439, 443-444 [284 P.2d 133], where injection of a "vitamin B complex" caused a "wrist drop.") Here there is no indication that the subject procedure, although it required skill, was of such great complexity that one of the inherent risks was the "kinking" of the tubing. (See *Siverson v. Weber,* 57 Cal.2d 834, 837 [22 Cal.Rptr. 337, 372 P.2d 97], where the occurrence of a fistula was one of the inherent risks in a hysterectomy.)

■ Adverting to the second condition, we observe that in dealing with the question whether it is more probable than not that the defendant's negligence caused the accident, it must be shown that the defendant had the management or control of the agency or instrumentality which caused the accident in order to eliminate the possibility that the accident was caused by someone other than the defendant. (*Roddiscraft, Inc. v. Skelton Logging Co., supra,* 212 Cal.App.2d 784, 798; *Springer v. Reimers, supra,* 4 Cal. App.3d 325, 334.) The requirement of control is not an absolute one, however. (*Zentz v. Coca Cola Bottling Co.,* 39 Cal.2d 436, 443 [247 P.2d 344].) Accordingly, the control element is satisfied if the defendant had control of the instrumentality at the time of the alleged negligent act, although not at the time of the accident *provided* the plaintiff produces evidence which is sufficient to show that the instrumentality was not mishandled or that its condition had not been changed after it left the defendant's possession. (*Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 687 [268 P.2d 1041]; *Trust v. Arden Farms Co.,* 50 Cal.2d 217, 220 [324 P.2d 583, 81 A.L.R.2d 332]; *Honea v. City Dairy, Inc.,* 22 Cal.2d 614, 617-618 [140 P.2d 369]; *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 458-459 [150 P.2d 436]; *Zentz v. Coca Cola Bottling Co., supra,* 39 Cal.2d 436, 444; *Baker v. B. F. Goodrich Co.,* 115 Cal.App.2d 221, 226-227 [252 P.d 24]; *Andrews v. Barker Brothers Corp.,* 267 Cal.App.2d 530, 534 [73 Cal.Rptr. 284].)

■ In the present case there is uncontradicted evidence that the con-

dition of the tubing was changed after it left Clay Adams' possession. After leaving Clay Adams' possession the tubing was soaked in a detergent solution and stretched by Dr. Paley, and then inserted over another tube. This process may well have weakened the tubing's resilient qualities. Accordingly, under the circumstances it cannot be said that it is more probable than not that the injury was the result of Clay Adams' negligence but it is at least equally probable that the accident was caused by some fault for which Clay Adams was not liable. The absence of the second requisite condition precludes, therefore, the application of the doctrine of res ipsa loquitur.

## Negligence

Plaintiff urges that there was substantial evidence of negligence to support a jury verdict in her favor against Clay Adams under the rule applicable to nonsuits. That evidence is asserted to consist of Clay Adams' failure to conduct tests of the PE-280 tubing to determine its strength and the expert's testimony that the tubing "kinked" easily. With respect to the evidence that the tubing "kinked" easily, plaintiff contends that such is evidence of negligent design and evidence that a duty to warn was breached.

The duty of a manufacturer of a product dangerous unless carefully made is defined in the Restatement Second of Torts, section 395: "A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied." (See *Sheward* v. *Virtue,* 20 Cal.2d 410, 412 [126 P.2d 345]; *Nebelung* v. *Norman,* 14 Cal.2d 647, 654 [96 P.2d 327]; *Kalash* v. *Los Angeles Ladder Co.,* 1 Cal.2d 229, 231-232 [34 P.2d 481]; *Reynolds* v. *Natural Gas Equipment, Inc.,* 184 Cal.App.2d 724, 736 [7 Cal.Rptr. 879].) A special application of this rule deals with the design of products placed on the market and is defined in the Restatement Second of Torts, section 398, as follows: "A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design." (See *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 470; *Varas* v. *Barco Mfg. Co.,* 205 Cal.App.2d 246, 258 [22 Cal.Rptr. 737]; *Darling* v. *Caterpillar Tractor Co.,* 171 Cal.App.2d 713, 720 [341 P.2d 23].)

In addition to the foregoing duties, the manufacturer has a duty to

use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use, if the manufacturer has reason to believe that they will not realize its dangerous condition. (Rest.2d Torts, §§ 388, 394; see *Tingey* v. *E. F. Houghton & Co.*, 30 Cal.2d 97, 102 [179 P.2d 807]; *Love* v. *Wolf*, 226 Cal.App.2d 378, 395 [38 Cal.Rptr. 183]; *Gall* v. *Union Ice Company*, 108 Cal.App. 2d 303, 309-310 [239 P.2d 48].)

Under the foregoing rules and the cases supporting them a failure by the manufacturer to fulfill that duty is negligence. The question whether there has been a breach of duty is usually a fact issue for the jury and may be resolved only as a matter of law if the circumstances do not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of him. (*Lysick* v. *Walcom*, 258 Cal.App.2d 136, 150 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Ishmael* v. *Millington*, 241 Cal.App.2d 520, 525 [50 Cal.Rptr. 592]; *Warner* v. *Santa Catalina Island Co.*, 44 Cal.2d 310, 317-318 [282 P.2d 12].) If there is room for honest difference of opinion between men of average intelligence as to whether there has been a breach of duty, the question becomes one of fact for the jury. (*Miller* v. *Western Pac. R. R. Co.*, 207 Cal.App.2d 581, 592 [24 Cal.Rptr. 785]; *Hudson* v. *Rainville*, 46 Cal.2d 474, 478 [297 P.2d 434].) Accordingly, it is only when men following the law can draw but one conclusion that the issue of negligence is determinable as a matter of law. (*Gray* v. *Brinkerhoff*, 41 Cal.2d 180, 183 [258 P.2d 834]; *Hudson* v. *Rainville, supra; Callahan* v. *Gray*, 44 Cal.2d 107, 111 [279 P.2d 963].)

In the light of the foregoing principles Clay Adams, as a manufacturer, was required to be reasonably careful to prevent dangerous conditions in the subject tubing caused by a miscarriage in the manufacturing process and to use reasonable care and skill in designing it so that it was reasonably safe for the purposes for which it was intended, and for other uses which were reasonably foreseeable. (See 2 Harper and James, The Law of Torts (1956) §§ 28.3 and 28.4, pp. 1540-1541, and § 28.11, p. 1557; Rest.2d Torts, *supra*, §§ 395, 398.) That duty was commensurate with the danger involved, i.e., Clay Adams was required to take reasonable precautions in the light of the dangerous propensities of its tubing. (Harper and James, *supra*, § 28.4, p. 1542; § 28.11, pp. 1557-1559; Rest.2d Torts, § 298, com. (b) and § 395, com. (e); see *Pike* v. *Frank G. Hough Co., supra*, 2 Cal.3d 465, 470.) In determining what precautions, if any, were required under the circumstances, the likelihood of harm, and the gravity of the harm if it happens, must be balanced against the burden of the precaution which would

be effective to avoid the harm. (Harper and James, *supra*, § 28.4, p. 1542; *Pike* v. *Frank G. Hough Co., supra.*)

In the instant case there was evidence from which the trier of fact could conclude that the tubing could do harm if it was imperfect. There was evidence that plaintiff's injury resulted from a "kinking" of the tubing. There was also evidence adduced by expert testimony that the tubing "kinked" easily, that it was more apt to "kink" when heated or soaked, and that once it became "kinked" it failed to recover physical integrity. In sum, there was evidence adduced from which the jury could infer that the condition of the tubing made it susceptible to "kinking" and that such a condition was an unreasonably dangerous one.

The jury was entitled to conclude that since the subject tubing was intended for use in body cavities Clay Adams should have recognized that unless the tubing was carefully made there was an unreasonable risk of harm. There was evidence that Clay Adams knew that its PE-280 tubing was being used in heart catheterizations. From this evidence the jury could infer that Clay Adams was aware of the methods used in adapting its tubing for use as a catheter and of the manner in which such catheters were being used in the catheterization procedures. Accordingly, whether Clay Adams took the necessary precautions to prevent dangerous conditions in the subject tubing in the light of these circumstances was a question for the jury, since it cannot be said that the only conclusion which could be reached is that Clay Adams did use reasonable precautions under the circumstances. A reasonable man of average intelligence could come to a different conclusion.

Adverting to the precautions taken by Clay Adams, we note the evidence that it conducted no tests on the tubing to determine its thickness and the uniformity and strength of its walls. ■ With respect to tests or inspections, it is well settled that where an article is such that it is reasonably certain, if negligently manufactured or designed, to place life and limb in peril, the manufacturer is chargeable with negligence if the defective condition could be disclosed by reasonable inspection and tests, and such inspection and tests are omitted. (*Sheward* v. *Virtue, supra*, 20 Cal.2d 410, 414; Rest.2d Torts, *supra*, § 395, coms. (e) and (f), pp. 327-328; see *Pike* v. *Frank G. Hough Co., supra*, 2 Cal.3d 465, 470.) ■ Applying this standard to the case at bench, we perceive that, at the very least, it was a question for the jury whether a reasonable test or inspection would have disclosed that the subject tubing had a propensity to "kink." If it found that such a reasonable inspection would have disclosed this propensity, the jury could decide that Clay Adams violated its duty to produce a product reasonably safe for its intended use either on the basis that it could have corrected this deficiency but failed to do so, or, on the basis that if the

deficiency was not susceptible of correction, Clay Adams failed to warn of the dangerous propensity.

We here point out that the fact that Dr. Paley may have been under a duty to plaintiff to make inspection of the tubing would not relieve Clay Adams from liability for any negligence arising from its duty as a manufacturer. (Rest.2d Torts, *supra*, § 396; see Harper and James, *supra*, §§ 28.10, pp. 1555-1557, and 28.11, p. 1557.) We also point out that whether Dr. Paley was using the tubing for the purpose intended was likewise a question for the jury as was the question whether the changes effected by him in the condition of the tubing was a proximate cause of the injury to plaintiff rather than any breach of duty on the part of Clay Adams. (See *Lysick* v. *Walcom, supra,* 258 Cal.App.2d 136, 153.)

### Express Warranty

Plaintiff asserts that Clay Adams expressly represented that its PE-280 tubing was fit for use in heart catheterization and that when the tubing "kinked" there was a breach of that warranty. Commercial Code section 2313, in pertinent part, provides: "(1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. . . . (2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but . . . a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

In applying this statute to the facts adduced in the present case, we first observe that, although plaintiff was not a buyer of the subject tubing, any express warranties made with respect thereto to the Hospital or Dr. Paley would inure to her benefit since the Hospital and Dr. Paley were acting as her agents in the use of such tubing upon her person in conjunction with the subject diagnostic procedure. (See *Grinnell* v. *Charles Pfizer & Co., supra,* 274 Cal.App.2d 424, 441; *Seely* v. *White Motor Co.,* 63 Cal.2d 9, 14 [45 Cal.Rptr. 17, 403 P.2d 145].)

Here there is no evidence that Clay Adams verbally or in writing expressly represented that the tubing was fit for heart catheterization. In its literature it stated that the tubing was useful for moving fluids into and from body cavities. This was clearly a statement relating to the subject tubing. Dr. Paley testified that from this statement he implied that the tubing was suitable for heart catheterization. In the light of these facts it was a ques-

tion of fact for the jury whether the statement made by Clay Adams in its literature was intended to include the movement of fluids into the femoral artery; whether the subject statement, if found to include femoral arteries as constituting "body cavities," was merely a statement of Clay Adams' opinion or commendation of the goods; and whether the subject statement became "part of the basis of the bargain" between Clay Adams, as seller, and the Hospital, as the buyer through its agent Dr. Paley. The fact that Dr. Paley also relied on medical journals for the suggestion that the subject tubing was suitable for heart catheterization was a circumstance to be considered in determining whether the subject statement was "part of the basis of the bargain." As pointed out in the Uniform Commercial Code comment to section 2313, comment 3, section 2313 "deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmation, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact."

Assuming that the trier of fact did find that there was an express warranty, the question whether a breach of that warranty occurred was likewise a question of fact for the jury under all the evidence; that is, it was for the jury to determine whether the tubing was reasonably fit for the purpose intended. (*Grinnell* v. *Charles Pfizer & Co., supra,* 274 Cal.App.2d 424, 441-442; *Tremeroli* v. *Austin Trailer Equip. Co.,* 102 Cal.App.2d 464, 467 [227 P.2d 923].)

## Opinion Evidence

 While under cross-examination by plaintiff's counsel Dr. Paley was asked whether, in his opinion, the catheter was caused to "kink" because of a defect in its walls which could not be detected by him on examination. An objection on the ground that the question called "for clear speculation" was sustained on the ground that Dr. Paley could not testify to "the ultimate facts."

 In considering this issue we observe, firstly, that a trial court has wide discretion as to when one qualifies as an expert (*Huffman* v. *Lindquist,* 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; *State Comp. Ins. Fund* v. *Operated Equipment Co.,* 265 Cal.App.2d 759, 765 [71 Cal.Rptr.

531]; *People* v. *Murray,* 247 Cal.App.2d 730, 735 [56 Cal.Rptr. 21]), and secondly, that once a witness properly qualifies as an expert witness he may express his opinion as to the ultimate fact in issue. (Evid. Code, § 805; *State Comp. Ins. Fund* v. *Operated Equipment Co., supra; People* v. *Wilson,* 25 Cal.2d 341, 345 [153 P.2d 720]; *Corn* v. *State Bar,* 68 Cal.2d 461, 466 [67 Cal.Rptr. 401, 439 P.2d 313]; *Magee* v. *Wyeth Laboratories, Inc.,* 214 Cal.App.2d 340, 357-358 [29 Cal.Rptr. 322].)

██ In the instant case although Dr. Paley was an expert in the fabrication and use of the catheter, there is a dearth of evidence indicating that he was, by force of special knowledge, experience or education, an expert on the subject of the tubing's chemical composition, its tensile strength, or its material construction. His only experience in this regard consisted of a visual and tactile examination. Under these circumstances it is doubtful that he was qualified to testify as to the ultimate issue embraced in the subject question. In sustaining the objection the court was apparently acting on the basis that Dr. Paley was not an expert witness on the subject to which the interrogation was directed.[2]

██ It is well settled that the exercise of the trial court's discretion as to whether one qualifies as an expert witness will be disturbed only for clear abuse. (*People* v. *Goldsworthy,* 130 Cal. 600, 605 [62 P. 1074]; *State Comp. Ins. Fund* v. *Operated Equipment Co., supra,* 265 Cal.App.2d 759, 765; *People* v. *Murray, supra,* 247 Cal.App.2d 730, 735.) ██ Under the record in this case we cannot say that the trial court abused its discretion.

### *Jury's Inquiry*

██ During the jury's deliberation as to whether Dr. Paley and the Hospital were liable for plaintiff's alleged injuries, a communication was sent to the trial judge inquiring "why Clay Adams withdrew from the case." The trial judge, without advising the parties or their counsel of this communication, directed the bailiff to advise the jury that they were not entitled to the information and that they were not to concern themselves with the information. Plaintiff asserts that this communication was violative of Code of Civil Procedure section 614 and constituted prejudicial error, on the basis that the jury was wrongfully permitted to infer from the judge's communication that a settlement had been made by Clay Adams, thus influencing the jury's decision with respect to the liability of Dr. Paley and the Hospital. In this respect, several jurors' affidavits to this effect were submitted on the motion for a new trial.

---

[2]In sustaining the objection the court stated: "He may testify as to what he saw, observed, tested, not the ultimate facts."

Code of Civil Procedure section 614 provides, essentially, that after the jury have retired for deliberation they may require the officer who has them in his charge to conduct them into court if there is a disagreement between them as to any part of the testimony or if they desire to be informed on any point of law arising in the cause, and that upon their being brought into court the information required must be given in the presence of, or after notice to the parties or counsel. We perceive such code section to be inapposite here. The inquiry made by the jury did not relate to any disputed testimony or any applicable point of law. We here observe, moreover, that the trial court's communication was merely a reiteration of an earlier explanation made in counsel's presence. We do point out, however, that it was irregular for the trial court to send any communication to the jury in the absence of counsel and without their express stipulation. (See *Nelson* v. *Southern Pacific Co.*, 8 Cal.2d 648, 655 [67 P.2d 682]; *Tice* v. *Pacific Elec. Ry. Co.*, 36 Cal.App.2d 66, 72-73 [96 P.2d 1022, 97 P.2d 844].) However, such error is not necessarily prejudicial. (*Carlson, Collins, Gordon & Bold* v. *Banducci,* 257 Cal.App.2d 212, 231 [64 Cal.Rptr. 915]; *Smith* v. *Shankman,* 208 Cal.App.2d 177, 185-186 [25 Cal.Rptr. 195]; *Sozzi* v. *Gull,* 218 Cal.App.2d 231, 236 [32 Cal.Rptr. 221].) In the present case plaintiff has made no showing of prejudice or any showing that a result more favorable to plaintiff would have occurred absent such error so as to justify this court in concluding that the asserted error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; see *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243].)

The only showing of prejudice attempted by plaintiff is through the jurors' affidavits aforementioned. Affidavits of jurors may be used to impeach their verdict only in certain limited situations. Such affidavits may be used to show that the verdict was reached by lot or chance and to show that one or more of the jurors concealed bias or prejudice on *voir dire. (People* v. *Hutchinson,* 71 Cal.2d 342, 346-348 [78 Cal.Rptr. 196, 455 P.2d 132].) They may also be used to impeach a verdict under the circumstances provided for in section 1150 of the Evidence Code. That section provides in subdivision (a) thereof as follows: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (See *People* v. *Hutchinson, supra,* at p. 349.)

*Hutchinson,* in interpreting Evidence Code section 1150, holds that the conduct, conditions or events which are alleged to have influenced the jury improperly must consist of overt acts which are objectively ascertainable, i.e., influences which are open to sight, hearing and other senses and thus subject to corroboration. (At pp. 349-350.) *Hutchinson* makes it clear, however, that a verdict may not be impeached by affidavits whose effect is to prove the subjective reasoning processes of the juror which can be neither corroborated nor disproved. (At pp. 349-350.)

 In the present case the only objective fact offered in proof of the conduct of the judge alleged to have improperly influenced the verdict is his statement that the jury was not entitled to the information requested by it. As a matter of law it cannot be said that such a statement was of such a character as was likely to have influenced the jury improperly. As to the remainder of the matters alleged in such affidavits, they consist of the inferences which the jurors making the affidavits drew from the judge's statement, notwithstanding they were advised not to concern themselves with the subject of their inquiry. These matters had the effect of proving the mental or reasoning processes of said jurors and, as such, were not subject to corroboration or disproof. Accordingly, they did not constitute competent evidence to impeach the verdict.

### Informed Consent

 Plaintiff requested that the jury be instructed that a doctor-patient relationship is one fiduciary in nature and a doctor accordingly must reveal all pertinent information to his patient. Such request was refused. Plaintiff urges such refusal was error since there was evidence that Dr. Paley failed to apprise plaintiff of the risks involved in the heart catheterization.

 It is the duty of a doctor to properly explain a contemplated procedure or operation to his patient in a manner which the patient can reasonably comprehend in order for the patient to give his informed or knowledgeable consent to the procedure or operation. (*Berkey* v. *Anderson,* 1 Cal.App.3d 790, 803-804 [82 Cal.Rptr. 67]; *Salgo* v. *Leland Stanford etc. Bd. Trustees,* 154 Cal.App.2d 560, 578 [317 P.2d 170].) Here, the evidence does not show that Dr. Paley withheld any information from plaintiff. Although plaintiff testified that Dr. Paley failed to explain the operation and its risks, she also testified that she had specifically requested not to be told about the intricacies of heart catheterization. Moreover, plaintiff, prior to the operation, looked into heart catheterization and stated she was aware of what it involved. In *Salgo* it was pointed out that a patient's mental and emotional condition is impor-

tant in certain cases and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent. (At p. 578.) Under the circumstances of this case it may not be said that plaintiff's consent to the procedure was not an informed one. Rather, the evidence was such that Dr. Paley's attempts at explanation were prevented by plaintiff's insistence on remaining ignorant of the risks involved and that Dr. Paley acceded to this request in the exercise of his discretion on the basis that an explanation of any risk involved might result in actually increasing the risks by reason of the psychological results of the apprehension itself. (See *Salgo* v. *Leland Stanford etc. Bd. Trustees, supra.*) Accordingly, we perceive no error in refusing the requested instruction.

### Instruction on Ordinary Negligence

■ The court refused to give plaintiff's proffered instruction on ordinary negligence. Such refusal was error, argues plaintiff, since there was evidence from which the jury could reasonably have concluded that Dr. Paley acted negligently.[3] In considering this contention we recognize that plaintiff was entitled to instructions consonant with the theory of her case if such enjoys evidentiary support. (*Phillips* v. *G. L. Truman Excavation Co.,* 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]; *Pedesky* v. *Bleiberg,* 251 Cal.App.2d 119, 121 [59 Cal.Rptr. 294]; *Davis* v. *Erickson,* 53 Cal.2d 860, 863 [3 Cal.Rptr. 567, 350 P.2d 535].)

Here plaintiff proceeded on the theory of medical malpractice and not on the theory of ordinary negligence. In *Tangora* v. *Matanky,* 231 Cal. App.2d 468, 479 [42 Cal.Rptr. 348], it was held not to be error to refuse to give an instruction on ordinary negligence in a malpractice action because of the particular standard of care applicable in such action. In a malpractice action the activity lies in the realm of medical treatment and is governed by malpractice standards. (See *Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Belshaw* v. *Feinstein,* 258 Cal.App. 2d 711, 718 [65 Cal.Rptr. 788]; *Simone* v. *Sabo,* 37 Cal.2d 253, 257 [231 P.2d 19]; *Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604].)

Plaintiff cites us to *Meier* v. *Ross General Hospital,* 69 Cal.2d 420, 433-434 [71 Cal.Rptr. 903, 445 P.2d 519], for the proposition that instructions on malpractice and ordinary negligence may both properly be given in the same case. We apprehend that in a proper case both instructions may be given. *Meier,* however, is distinguishable from the present case. There,

---

[3]Plaintiff argues that such evidence consisted of Dr. Paley's stretching or handling of the catheter from which the jury could infer that he stretched it too far or otherwise mishandled it.

in addition to a charge of malpractice on the part of a treating doctor, the action was based on ordinary negligence predicated upon the claim that an employee of a hospital left a window open through which the decedent jumped. Here, the case was tried on the theory that Dr. Paley, in performing the subject procedure, did not use the standard of care required of a doctor in the realm of medical treatment as prescribed by medical malpractice decisional rules.

## Conclusion

In view of the foregoing we conclude that in the face of a motion for nonsuit, there was sufficient evidence to support a jury verdict in favor of plaintiff as against Clay Adams on the basis of ordinary negligence and breach of express warranty; and we conclude that none of the assignments of error urged against the judgment in favor of Dr. Paley and the Hospital have merit.

The judgment is affirmed as to defendants Dr. Paley and the Hospital. The judgment is reversed as to Clay Adams. Dr. Paley and the Hospital shall recover their costs on appeal from plaintiff. Plaintiff shall recover one-half of her costs on appeal from Clay Adams.

Sims, J., and Elkington, J., concurred.